[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**RECEIVED**

OCT 7 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Carlton Theodore Landis

_____

(Enter above the full name
of the plaintiff or plaintiffs in
this action)

vs.

Lieutenant Murton

Lieutenant Erskine

Correctional Officer Maybury

~~[redacted]~~

~~[redacted]~~

~~[redacted]~~

Case No: 19-50257
(To be supplied by the Clerk of this Court)

(See Attached for more defendants)

(Enter above the full name of ALL
defendants in this action. Do not
use "et al.")

**CHECK ONE ONLY:**

___  COMPLAINT UNDER THE CIVIL RIGHTS ACT, TITLE 42 SECTION 1983
U.S. Code (state, county, or municipal defendants)

✓  COMPLAINT UNDER THE CONSTITUTION ("BIVENS" ACTION), TITLE
28 SECTION 1331 U.S. Code (federal defendants)

___  OTHER (cite statute, if known)

**BEFORE FILLING OUT THIS COMPLAINT, PLEASE REFER TO "INSTRUCTIONS FOR FILING." FOLLOW THESE INSTRUCTIONS CAREFULLY.**

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

I. **Plaintiff(s):**

   A. Name: Carlton Theodore Landis
   B. List all aliases: Carlton Theodore Landers
   C. Prisoner identification number: 24449-006
   D. Place of present confinement: AUSP Thomson
   E. Address: P.O. Box 1001, Thomson, IL 61285

   (If there is more than one plaintiff, then each plaintiff must list his or her name, aliases, I.D. number, place of confinement, and current address according to the above format on a separate sheet of paper.)

II. **Defendant(s):**
   (In A below, place the full name of the first defendant in the first blank, his or her official position in the second blank, and his or her place of employment in the third blank. Space for two additional defendants is provided in B and C.)

   A. Defendant: Lieutenant Murton
      Title: Lieutenant
      Place of Employment: AUSP Thomson

   B. Defendant: Lieutenant Erskine
      Title: Lieutenant
      Place of Employment: AUSP Thomson

   C. Defendant: Correctional Officer Maybury
      Title: Correctional Officer
      Place of Employment: AUSP Thomson

   (If you have more than three defendants, then all additional defendants must be listed according to the above format on a separate sheet of paper.) (See attached)

2

Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

III. List ALL lawsuits you (and your co-plaintiffs, if any) have filed in any state or federal court in the United States:

A. Name of case and docket number: Landis v. Ebbert, Et Al.; 1:19-CV-470-CCC-CA

B. Approximate date of filing lawsuit: March 15, 2019

C. List all plaintiffs (if you had co-plaintiffs), including any aliases: Carlton Theodore Landis

D. List all defendants: David T. Ebbert, Ian Connors, J. Ray Ormond, Bureau of Prisons, Hugh Hurwitz, D. Langton, J. Savidge, M. Condit, J. Konkle, Correctional Officer Steese, Correctional Officer Moyer, Correctional Officer Hackenburg, J. Sienkiewicz

E. Court in which the lawsuit was filed (if federal court, name the district; if state court, name the county): Middle District of Pennsylvania

F. Name of judge to whom case was assigned: Chief Judge Christopher C. Conner

G. Basic claim made: Defendants unjustly revoked plaintiff's recreation privilege in violation of Freedom of Speech, Due Process, and Cruel and unusual punishment.

H. Disposition of this case (for example: Was the case dismissed? Was it appealed? Is it still pending?): Still pending. Summons were sent to defendants, they have until October 29, 2019, to file a responsive pleading.

I. Approximate date of disposition: N/A

(See attached)

IF YOU HAVE FILED MORE THAN ONE LAWSUIT, THEN YOU MUST DESCRIBE THE ADDITIONAL LAWSUITS ON ANOTHER PIECE OF PAPER, USING THIS SAME FORMAT. REGARDLESS OF HOW MANY CASES YOU HAVE PREVIOUSLY FILED, YOU WILL NOT BE EXCUSED FROM FILLING OUT THIS SECTION COMPLETELY, AND FAILURE TO DO SO MAY RESULT IN DISMISSAL OF YOUR CASE. CO-PLAINTIFFS MUST ALSO LIST ALL CASES THEY HAVE FILED.

3

Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

IV. **Statement of Claim:**

State here as briefly as possible the facts of your case. Describe how each defendant is involved, including names, dates, and places. **Do not give any legal arguments or cite any cases or statutes.** If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. (Use as much space as you need. Attach extra sheets if necessary.)

1. On July 31, 2014, plaintiff was brought out of his cell to participate in an intake screening before a case manager (name unknown). During the screening, plaintiff told the case manager that plaintiff cooperated with authorities before and, consequently, was on protective custody ("PC") at USP Lewisburg before arriving at AUSP Thomson. The case manager told me that there was no general population ("GP") at AUSP Thomson, so there would be no need for plaintiff to be placed in PC, which the case manager claimed did not exist, particularly for inmates in holdover status such as plaintiff. Plaintiff debated with the case manager about the non-existent PC, explaining to her that it could not be true because AUSP Thomson was still the Bureau of Prisons ("BOP") and holdover status inmates, even at other BOP facilities, had the PC option available to them. When I refused to sign the Intake-screening form, which detailed the contents of plaintiff's interview with the

4                                                           Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Case Manager about PC, the case manager changed the portion of the form which would have said that I did not have a problem with going to GP, and I signed the form, letting the case manager know beforehand that I did have a problem with going to GP, for if plaintiff would have said that he did not have a problem with going to GP, it would have meant that plaintiff could be housed with any inmate.

2. When plaintiff left the intake screening, plaintiff was placed into a holding cage next to another inmate, Monterio Wiggins, who was in another holding cage directly beside plaintiff. Based on the conversation plaintiff had with the case manager (paragraph #1), plaintiff figured that prison officials at AUSP Thomson would haphazardly classify inmates when making decisions about cell assignments; consequently, plaintiff explained to Inmate Wiggins, just in case prison officials tried to house us together, that plaintiff was on PC because plaintiff cooperated with authorities before. Plaintiff then asked Inmate Wiggins if...

(See attached)

5

Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**V.   Relief:**

State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.

Compensatory and punitive damages in the amount of $10,000, or whatever the Court deems appropriate; Injunctive and Declaratory relief, forcing the defendants to follow their own regulations in regard to the use of force and the application of restraints, as outlined in the Code of Federal Regulations and Program Statements, to enforce PC placement for inmates, all inmates, at AUSP Thomson, to stop assigning inmates to dangerous cell assignments... (see attached)

VI.   The plaintiff demands that the case be tried by a jury.   ☑ YES   ☐ NO

## CERTIFICATION

By signing this Complaint, I certify that the facts stated in this Complaint are true to the best of my knowledge, information and belief. I understand that if this certification is not correct, I may be subject to sanctions by the Court.

Signed this __28th__ day of __September__, 20__19__

_____
(Signature of plaintiff or plaintiffs)

Carlton T. Landis
(Print name)

24449-056
(I.D. Number)

Administrative United States Penitentiary
P.O. Box 1001
Thomson, IL 61285
(Address)

## Caption (Cont.)

Warden Hudson
Lieutenant Diercher
John Doe
Correctional Officer Young
Lieutenant Rohbaugh
Lieutenant Martinez
John Doe

## II. (Cont.)

D. Warden Hudson
   Warden
   AUSP Thomson

E. Lieutenant Dierker
   Special Investigation Service Technician
   AUSP Thomson

F. John Doe
   Correctional Officers of the Calculated Use of Force Team
   AUSP Thomson

G. Correctional Officer Young
   Correctional Officer
   AUSP Thomson

H. Lieutenant Bohbaugh
   Special Investigation Service Technician
   AUSP Thomson

I. John Doe
   Prison officials that participated in the fifteen-minute and two-hour restraint checks
   AUSP Thomson

## III. (Cont.)

### Second Suit

A. Landis v. Martin, Et Al.; 3:19-CV-177-DPJ-FKB.

B. March 15, 2019.

C. Carlton Theodore Landis.

D. M. Martin, Unknown Curry, L. Singleton, Unknown Evans, Unknown Lott, Unknown Rogers, E. Crimaldi, R. Taylor, John Doe #1, John Doe #2.

E. Southern District of Mississippi.

F. F. Keith Ball.

G. Defendants unjustly kept plaintiff in segregation for six months in violation of Freedom of Speech and Cruel and Unusual Punishment.

H. Still pending. Summons were sent to defendants.

I. N/A

### Third Suit

A. Landis v. Wilson, Et Al.; 1:19-CV-1301-CCC-CA

B. July 27, 2019.

C. Carlton Theodore Landis

D. Lieutenant Wilson, Lieutenant Beachel, Lieutenant Scott, Lieutenant Troutman, Lieutenant Ordonez, Lieutenant Taylor, Lieutenant Leonawicz, David J. Ebbert, Associate Warden Calbert, Nurse Mitterling, Nurse Dees, Jesse Ayers, Hugh Herwitz, C.O. Earp, C.O. Stroud, Ian Connors, Bureau of Prisons, J. Hankie, Steve Brown, J. Enigh, John Doe, John Doe, J Ray Ormond, John Doe, M. Burner.

E. Middle District of Pennsylvania.

F. Chief Judge Christopher C. Conner

G. Defendants' malicious use of force and application of restraints in violation of Cruel and Unusual Punishment.

H. Still pending   IFP motion not approved.

I. N/A

## IV. Statement of Claim (Cont.)

he was on PC, which infuriated Inmate Wiggins to the point that he threatened plaintiff, saying that "I'ma slap the shit out of you." Shortly thereafter, Inmate Wiggins was pulled out of the holding cell and escorted to participate in the intake screening with the case manager.

3. Inmate Wiggins returned from the intake screening and was escorted to a cell; at that point, plaintiff was pulled out of the holding cell by Correctional Officer ("C/O") Young and escorted to the cell where Inmate Wiggins was located. En route to the cell where Inmate Wiggins was located, plaintiff told C/O Young that I was threatened by Inmate Wiggins, but C/O Young stated, "You're carrying your ass in the cell with him no matter what. I don't give a damn if y'all kill each other."

4. After Inmate Wiggins and plaintiff were placed in the cell and the door was shut, Inmate Wiggins yelled at C/O Young, saying "Hey, this isn't my cell. I'm not supposed to be in here." As Inmate Wiggins made this proclamation, he darted toward plaintiff with his right leg extended, as if attempting to kick plaintiff; in response, plaintiff struck Inmate Wiggins several times, and C/O Young maced Inmate Wiggins and plaintiff, ending the altercation.

5. On or about August 7, 2019, plaintiff was called out of his cell to speak with two prison officials, Lieutenant ("Lt.") Rohbough and Lt. Ducker, from the Special Investigation Services ("SIS") Department about plaintiff's altercation with Inmate Wiggins. During plaintiff's conversation with the two SIS officials, they

1

told plaintiff that there was no PC for holdover-status inmates, that all inmates would be forced to accept a cellmate of their (prison officials) choosing, and that they paired inmates together based on where the inmates were from (before prison officials tried to house plaintiff with Inmate Wiggins, they attempted to house plaintiff with inmate Tracy Hardin, who, like plaintiff, was from North Carolina, but Inmate Hardin refused, as he and plaintiff were previously at USP Lewisburg together and he knew that plaintiff had cooperated with authorities before). Once plaintiff explained to them that there had to be PC for all inmates at AUSP Thomson, which was a BOP facility, and that plaintiff was on PC at USP Lewisburg, they claimed to not have access to records from USP Lewisburg to be able to know that plaintiff was on PC; when plaintiff told them that the case manager was informed (paragraph #1) during the intake screening, they said that they (SIS) do not look at that intake screening; and when plaintiff told them that the SIS Department usually does an intake screening when an inmate arrives at any BOP institution, they had no explanation as to why they did not conduct their own intake screening when plaintiff arrived at AUSP Thomson.

6. On or about August 12, 2019, inmates Tony Knotts and Dayton Poke, who were cellmates, were put in maliciously tightened ambulatory restraints for refusing to go back in the cell with each other. While they were in restraints, they continued to refuse to go back in the cell together, and, consequently, Lt. Murton assaulted Inmate Knotts and kept Inmate Poke in tightened restraints until he agreed to go in the cell with plaintiff.

7. On August 13, 2019, C/O Hernandez came to the shower in order to escort plaintiff to his cell. While handcuffing plaintiff in the shower, plaintiff inadvertently brushed his hand against C/O Hernandez's hand. In response, Hernandez stated, "Don't be touching my hand." As C/O Hernandez was bringing plaintiff out of the shower, plaintiff stated, jokingly, in response to C/O Hernandez's accusation, "I didn't mean to touch your hand, but they are soft." In route to plaintiff's cell, C/O Hernandez stated that she could give plaintiff an incident report for touching her; plaintiff responded by telling C/O Hernandez that one more incident report against plaintiff would not matter to plaintiff. C/O Hernandez's facial expression showed that she was infuriated by plaintiff's response. After plaintiff entered his cell, C/O Hernandez commenced to uncuff plaintiff while deliberately brushing her hands against plaintiff's hands, feigning to struggle removing the handcuffs from plaintiff. At one point while C/O Hernandez was just about finished removing the handcuffs, C/O Hernandez stated, "Stop grabbing my hand." Plaintiff brushed off her statement, as plaintiff was well aware that he never grabbed her hand; the contact was strictly incidental to C/O Hernandez removing the handcuffs from plaintiff. C/O Hernandez and plaintiff never argued or exchanged unpleasantries during our encounter. Plaintiff simply walked away from the door without saying anything to C/O Hernandez.

8. About an hour after plaintiff's encounter with C/O Hernandez, the Calculated Use of Force Team ("Team") showed up at plaintiff's cell door. In response, plaintiff peacefully

3.

submitted to the confrontational avoidance procedures initiated by the Team, which was commandeered by Lt. Murton. The Team applied handcuffs and shackles to plaintiff and escorted plaintiff to an outer hallway, where plaintiff was strip searched, placed in paper clothing, and put in the most restrictive form of ambulatory restraints (metal handcuffs with blackbox, metal waist chain, and metal shackles), even though plaintiff was cooperative and in control of himself. As plaintiff was being subjugated like a serial killer, plaintiff continued to ask the prison officials (Lt. Murton and John Does) why plaintiff was being put in restraints, but plaintiff never received an answer. Furthermore, plaintiff informed the Team members that they were not following proper procedure in regard to the use of force and the Application of Restraints, as outlined in the Code of Federal Regulations ("CFR") and Program Statements. In particular, plaintiff informed the Team members that they were applying excessive force by ignoring the rule of "Progressive Restraints" (plaintiff was peacefully subdued and compliant with handcuffs behind the back; applying black box, waist chain, and shackles was unnecessary), by not utilizing soft (leather, etc.) restraints instead of hard (metal) restraints (BOP policy dictates that soft restraints "must" be used unless otherwise proven ineffective), and by applying the handcuffs too tight (Lt. Murton struggled to put a sliver of his finger in between the handcuff and the bottom of plaintiff's wrist when checking the restraints for tightness). The Team members and the nurse (Jane Doe) ignored plaintiff's pleas for them to loosen plaintiff's restraints.

14

9. During his two-hour restraint checks, Lt. Murton told plaintiff that plaintiff was placed in restraints due to plaintiff assaulting an officer, though he refused to tell plaintiff who. Lt. Murton claimed that anytime an inmate assaults an officer, the inmate must be put in restraints. Plaintiff denied assaulting an officer and told Lt. Murton that every assault on an officer does not justify putting an inmate in restraints, particularly if the inmate is in control of himself directly after the assault. Lt. Murton then stated that plaintiff would remain in restraints until plaintiff showed a pattern of calm behavior, which he said with a sinister grin; In response, plaintiff told Lt. Murton that plaintiff was aware that he would prevaricate on the restraint-check form, claiming that plaintiff lodged threats and/or vulgar comments toward him, in order to justify keeping plaintiff in restraints.

10. During his two-hour restraint checks, Lt. Ershine ordered C/O Maybury to tighten plaintiff's leg restraints, as Lt. Ershine told plaintiff that inmates who assault officers would be punished. C/O Maybury tightened plaintiff's leg restraints to the point that plaintiff was in extreme pain, particularly when trying to walk.

11. During their two-hour restraint checks, Lt. Ershine and Lt. Murton told plaintiff that because plaintiff assaulted an officer, plaintiff would be put in the cell with inmate Dayton Pohe. Plaintiff told Lt. Ershine and Lt. Murton that plaintiff could not be in the cell with Inmate Pohe because plaintiff cooperated with authorities before, which Inmate Pohe knew

5.

and which was the reason Inmate Poke had previously refused to accept plaintiff as a cellmate at USP Lewisburg; irrespective of this revelation, plaintiff offered Lt. Ershine and Lt. Murton, they insisted that I would go into the cell with Inmate Poke, claiming that the only way plaintiff could get out of being in the cell with Inmate Poke was to fight him, which Lt. Ershine claimed he would like because then he could mace the hell out of plaintiff and Inmate Poke. Lt. Ershine and Lt. Murton also claimed that PC did not exist for inmates in holdover status, which meant that anyone could be plaintiff's cellmate, and that if plaintiff refused to go in the cell with Inmate Poke, plaintiff would be put back in restraints until plaintiff agreed.

12. While plaintiff was in restraints, Lt. Ershine, Lt. Murton and John/Jane Does manipulated the restraint-check forms, by falsely claiming that plaintiff was not in control of himself, in order to justify keeping plaintiff in restraints.

13. Plaintiff was maliciously kept in tightened restraints for approximately twenty-four hours.

14. On August 14, 2019, in order to escape continued placement in tightened ambulatory restraints, Inmate Poke, who had a broken hand, and plaintiff agreed to go in the cell together with the understanding that we would split up in the near future. Dayton Poke told plaintiff that the only reason he accepted being in the cell with plaintiff was to get out of restraints, as his restraints were extremely

tight and he had a broken hand, which he acquired from getting into an altercation with another inmate several days prior to being put in restraints.

15. When released from restraints, plaintiff and Inmate Pope had open wounds and bruises around our wrists and ankles. Plaintiff submitted a sick-call request to Nurse Bice about the injuries, but plaintiff was never seen in regard to the injuries, as medical staff claimed that AUSP Thomson did not have a doctor, and that plaintiff's wounds would heal with time.

16. On or about September 3, 2019, plaintiff and Inmate Pope ceased being cellmates due to plaintiff's prior cooperation with authorities. Plaintiff was left in a single cell; Inmate Pope moved into the cell with inmate Derrick Hayes, who was never on PC status.

17. Lieutenants Martinez, Diercher, and Fohbaugh were the persons who authorized — without first conducting intake screenings or interviews to ascertain if we were compatible — plaintiff to be cellmates with inmates Wigains, Hardin, and Pope, even though these inmates were in opposition to being in the cell with plaintiff due to plaintiff's prior cooperation with authorities.

18. Since plaintiff has been at AUSP Thomson, plaintiff has witnessed Lieutenants Martinez, Diercher, Fohbaugh, Murton, and Erskine, and other prison officials, forcibly placing inmates in dangerous cell assignments, wherein inmates are forced to

7.

either fight each other or be put in maliciously tightened restraints for refusing to accept the cell assignment.

19. Since plaintiff has been at AUSP Thomson, plaintiff has witnessed all the defendants deliberately violating Bureau of Prisons policy in regard to the Use of Force and Application of Restraints by (a) initially applying the most restrictive form of ambulatory restraints (metal handcuffs with blackbox, metal waistchain, and metal shackles) when the situation does not require it, (b) manipulating the restraint-check forms to justify keeping inmates in restraints until these malicious officials believe that the inmates have learned their lesson, (c) initially applying hard restraints instead of soft restraints, (d) falsely claiming that inmates in restraints are resisting them in order to justify using force on the inmates and putting the inmates in four-point restraints, and (e) maliciously tightening restraints in order to force compliance from the inmates.

20. Since plaintiff has been at AUSP Thomson, I have witnessed defendants Erskine, Maybury, and Young participate in assaults on inmates at AUSP Thomson. These assaults consisted of these defendants punching inmates in the face and groin, violently slamming inmates on the ground, beating inmates' hands and wrists with a baton, spitting on inmates, using excessive mace on inmates, and maliciously tightening inmates restraints. The assaults are usually perpetrated by a particular crew of prison officials consisting of Lt. Erskine, C/O Maybury, C/O Young, C/O Albertson, C/O Winter, C/O Smith, C/O Mullins, and others whose names are unknown to plaintiff. This crew targets particular inmates to assault, such as inmates Delaboin, Wossen, Wiggins,

8

Riggleman, Pone, Hayes, Burr, etc. On one occasion, after inmate Monterio Wiggins exposed himself to Dr. McCrea, Lt. Erskine lied and said that inmate Wiggins slipped his handcuffs en route to another cell so that he could justify putting Inmate Wiggins in restraints, once Inmate Wiggins was in restraints, Lt. Erskine repeatedly assaulted Inmate Wiggins by striking him in the face and groin during restraint checks. On another occasion, after inmate Rodney Delaboin popped open his security box, Lt. Erskine came to Inmate Delaboin's cell, handcuffed him, opened his cell door and pushed him back inside of his cell, where, while surrounded by other correctional officers, Lt. Erskine punched him in the face and kneed him in the groin, daring Inmate Delaboin to "say something."

9.

## V. (Cont.)

to conduct intake screenings — to be conducted by the SIS Department, in particular — of all AUSP Thomson inmates to ascertain if the inmates require PC status, to house PC inmates with other PC inmates who do not have qualms with the reason(s), if known, each other is on PC.